**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JUAN FINCH, JR., and MARK TOIGO,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 22 C 1508** |
| | ) | |
| **MARIO TRETO, JR., in his official** | ) | |
| **Capacity as Acting Secretary of the** | ) | **Judge Rebecca R. Pallmeyer** |
| **Illinois Department of Financial and** | ) | |
| **Professional Regulation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case is a challenge to the constitutionality of the criteria that govern the issuance of licenses for operating dispensaries of recreational cannabis in the State of Illinois. Plaintiffs, who are aspiring owners of such dispensaries, argue that the State's preference for Illinois residents in this licensing scheme violates the Commerce Clause of the United States Constitution. In this motion, they seek a preliminary injunction against the secretary of the agency that administers the licensing scheme in question. The injunction would (1) prevent the agency from formally issuing dispensary licenses that were allocated using the disputed criteria in 2021, and (2) prevent the agency from enforcing the disputed criteria (or similar criteria) going forward, including in a lottery that will occur later in 2022. For the reasons given below, the court concludes that the equities do not support the relief requested here. Plaintiffs' motion is denied.

## FACTUAL BACKGROUND

Plaintiffs Juan Finch, Jr. and Mark Toigo each hope to own a recreational cannabis dispensary in Illinois. (Decl. of Juan Finch, Jr. [7-2] (hereinafter "Finch Decl.") ¶¶ 2, 4–8; Decl. of Mark Toigo [7-3] (hereinafter "Toigo Decl.") ¶¶ 3, 5–7.)[1] Plaintiff Finch has resided in Illinois since

---

[1] Affidavits "are fully admissible in summary proceedings, including preliminary-injunction proceedings." *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997).

December 2021 (Finch Decl. ¶ 2), while Plaintiff Toigo is a resident of Pennsylvania (Toigo Decl. ¶ 2).  Defendant Mario Treto, Jr. is the Secretary of the Department of Financial and Professional Regulation (the "Department").[2]  The Department is the Illinois agency responsible for issuing licenses to recreational cannabis dispensaries under the Cannabis Regulation and Tax Act, 410 ILCS 705/1-1 *et seq.* ("Cannabis Act"); *see also id.* § 15-5(b).

## I.     The Cannabis Act

Illinois enacted the Cannabis Act in June 2019.  *See* Cannabis Regulation and Tax Act, 2019 Ill. Legis. Serv. P.A. 101-27 (West).  The statute legalized the recreational use of cannabis by adults in Illinois, *see* 410 ILCS 705/10-5(a); provided for expungement of criminal records for certain marijuana offenses, *see* 20 ILCS 2630/5.2(i); and created a licensing scheme to regulate the newly legalized market "in a manner similar to alcohol," *see* 410 ILCS 705/1-5(b).   To sell cannabis to adults in Illinois for recreational use, a vendor must first obtain a license from the Department.[3]  *Id.* § 15-5(c); *see also id.* § 1-10 (defining "dispensing organization").

This case concerns a preliminary form of license referred to as a "Conditional Adult Use Dispensing Organization License."  Although this conditional license "does not entitle the recipient to begin purchasing or selling cannabis or cannabis-infused products," it "reserves the right" to a full-status license (an "Adult Use Dispensing Organization License") if the conditional licensee meets certain additional requirements of the Cannabis Act.  *Id.* § 1-10 (defining "Conditional Adult Use Dispensing Organization License"); *see also id.* §§ 15-25(f), 15-36(a).  Plaintiffs challenge only the process for obtaining a conditional license, not the additional requirements for converting

---

[2]     *About IDFPR*, ILL. DEP'T OF FIN. & PROF'L REG. (last visited June 1, 2022), https://idfpr.illinois.gov/About/About.asp.  Because Defendant Treto is sued in his official capacity as Secretary of the Department, the court refers to him as the "Department" throughout this opinion.

[3]     The licensing scheme at issue in this case does not govern the dispensing of cannabis for medical use, *see, e.g.*, 410 ILCS 705/15-10, 15-15, 15-20, nor does it apply to cannabis growers, cultivators, and transporters, *see, e.g.*, *id.* § 705/5-10.  It applies only to the dispensing of cannabis for adult, recreational use.

it to a full-status license, so for purposes of this opinion, the court will refer to the conditional license simply as a "license."

As the court will explain in more detail below, the Department has already attempted to allocate a total of 185 licenses in three batches. *See* 410 ILCS 705/15-25 (directing the Department to issue up to 75 licenses); *id.* § 15-35 (55 more); *id.* § 15-35.10 (55 more). And the Department is required to issue at least 50 additional licenses later this year. *Id.* § 15-35.20. Eventually, the Department may issue up to a total of 500 full-status licenses, though the Cannabis Act does not specify how soon the Department can or should reach that limit. *See id.* § 15-35.20. Significantly, no "Conditional Adult Use Dispensing Organization Licenses" have officially been "issued" yet.[4] (*See* Pls.' Mot. [7] at 11; Def.'s Resp. [20] at 8.) Until recently, the 185 licenses that the Department allocated in 2021 were tied up in state court litigation; now, they remain subject to the Department's promise that it will not issue them until this court rules. As for

---

[4]    Though the parties do not discuss it, there was another avenue for certain applicants to receive a full-status license. *See* 410 ILCS 705/15-36(a). Under the Cannabis Act, already-licensed medical cannabis dispensing organizations could apply for an "Early Approval Adult Use Dispensing Organization License," *id.* § 15-15, or an "Early Approval Adult Use Dispensing Organization License at a secondary site," *id.* § 15-20. Both types of license permitted medical dispensaries to sell cannabis to recreational purchasers as of January 1, 2020; if the medical dispensary received a "secondary site" license, it could sell recreational cannabis "at a different dispensary location from its existing registered medical dispensary location." *Id.* § 1-10 (defining "Early Approval Adult Use Dispensing Organization License" and "Early Approval Adult Use Dispensing Organization at a secondary site").

According to the statutory text, any Early Approval license had to be renewed by March 31, 2021. *Id.* §§ 15-15(k), 15-20(*o*). The renewed Early Approval "secondary site" licenses will apparently expire at an unidentified date, *see id.* § 15-20(p), and the remaining renewed Early Approval licenses expired on March 31, 2022, *id.* § 15-15(*l*). At expiration, both types of Early Approval licensees may apply for a full-status Adult Use Dispensing Organization License. *Id.* §§ 15-15(*l*), 15-20(p). So long as the licensee meets certain statutory criteria (different than the criteria to qualify for a conditional license), the Department "shall grant" the application. *Id.*

The Department has presented no information on these Early Approval licenses. But numerous dispensaries in Illinois are currently selling recreational-use cannabis, presumably under this alternative licensing process for medical dispensaries. *See* Ill. Dep't of Fin. & Prof'l Reg., *Licensed Adult Use Cannabis Dispensaries* (last visited June 1, 2022), https://idfpr.illinois.gov/LicenseLookup/AdultUseDispensaries.pdf. The Department has not explained whether these already-operating dispensaries count towards the 500 full-status licenses available under the Cannabis Act.

the 2022 licenses, the Department has not yet finalized the rules that will govern how they are allocated.

## II.    2021 Lotteries

When the Cannabis Act was adopted in 2019, the statute directed the Department to issue up to 75 licenses before May 1, 2020.  *See* 410 ILCS 705/15-25(a).  The Act provided that these licenses would be allocated across 17 specific geographic regions of Illinois in proportion to each region's population: 47 licenses for the Chicago–Naperville–Elgin region, three for the Peoria region, two for the Rockford region, and so on.  *See id.* § 15-25(c).  Applications were due on January 1, 2020.  *Id.* § 15-25(b).  To apply for a license, a vendor had to submit various documents and pay a nonrefundable $5,000 fee.  *Id.* §§ 15-25(d), 15-30(a).

The Cannabis Act directed the Department to allocate licenses through a competitive, point-based system.  Each application could receive up to 250 points (plus 2 bonus points).  *See* 410 ILCS 705/15-30(c) (250 points); *id.* § 15-30(d) (2 bonus points).  Points were awarded to recognize strengths in the applicant's proposals and to promote certain prosocial goals.  For example, an applicant could earn 15 points for an effective employee training plan; 65 points for security and recordkeeping plans; 65 points for an effective business plan; 30 points for their knowledge of and experience in the cannabis industry; 5 points for their employment practices; 5 points for their environmental plan; 5 points for their status as a veteran; 5 points for their diversity plan; 5 points for having an "Illinois owner"; and 50 points for qualifying as a "Social Equity Applicant."  *Id.* § 15-30(c).  In the event of a tie among applicants in a particular geographic region, an applicant could also be awarded 2 bonus points for a community-engagement plan.  *Id.* § 15-30(d).

The "Illinois owner" and "Social Equity Applicant" items are significant here because both expressly require state residency.  To obtain the 5 possible points for having an "Illinois owner," an applicant must be "51% or more owned and controlled by an Illinois resident[] who can prove residency in each of the past 5 years."  *Id.* § 15-30(c)(8).  To qualify as a "Social Equity Applicant,"

4

worth 50 points, an applicant must be an Illinois resident and meet at least one of the following

three criteria:

> (1) an applicant with at least 51% ownership and control by one or more individuals who have resided for at least 5 of the preceding 10 years in a Disproportionately Impacted Area;

> (2) an applicant with at least 51% ownership and control by one or more individuals who:

>> (i) have been arrested for, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under this Act; or

>> (ii) is a member of an impacted family [defined as an individual who has a parent, legal guardian, child, spouse, or dependent, or was a dependent of an individual that satisfies (i)];

> (3) for applicants with a minimum of 10 full-time employees, an applicant with at least 51% of current employees who:

>> (i) currently reside in a Disproportionately Impacted Area; or

>> (ii) have been arrested for, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under this Act or member of an impacted family.

*Id.* §§ 1-10, 15-30(c)(5). By definition, all "Disproportionately Impacted Areas" are in Illinois. (*See*

Pls.' Mot. at 10; Def.'s Resp. at 6.) *See also* 410 ILCS 705/1-10; *Disproportionate Impacted Area*

*Map*, ILL. DEP'T OF COM. (last visited June 9, 2022), https://www2.illinois.gov/dceo/Cannabis

Equity/Pages/DisproportionateImpactedAreaMap.aspx. Similarly, prior cannabis offenses must

have been committed in Illinois to be eligible for expungement under the Cannabis Act. (*See* Pls.'

Mot. at 10.) *See also* 20 ILCS 2630/5.2(a)(1)(G-5) (defining "Minor Cannabis Offense" as a

violation of certain provisions of the Cannabis Control Act); *id.* § 5.2(i) (providing for expungement

of "Minor Cannabis Offenses").

Neither Plaintiff applied before the January 2020 deadline. (Decl. of Cecilia Abundis [20-

3] ¶ 3.) Plaintiff Finch has declared that he "attempted" to apply but gave up after sensing that

his application was "doomed," given his lack of Illinois residency. (Finch Decl. ¶ 5.) Plaintiff Toigo

has likewise declared that he "would have applied" if doing so had not been "a futile exercise,"

5

though he was less forthright about whether he knew about the statute before the application deadline had passed. (*See* Toigo Decl. ¶ 5.)

Although Plaintiffs did not apply by the January 2020 deadline, 937 applicants did.[5] (Def.'s Resp. at 6.) The Department had intended to issue licenses to the 75 top-scoring applications, but that plan proved unworkable: For each of the 17 geographic regions, the number of applicants who received a perfect score (250 points plus the 2 bonus points awarded in the event of a tie) was higher than the number of licenses available for issuance in that region.[6] (*Id.* at 6–7.) The Department therefore announced on September 3, 2020, that it would conduct a tie-breaker lottery among the applicants who had received perfect scores. (*Id.*) Around the same time, several applicants challenged the Department's scoring process in state court, and the Department announced that it would conduct a deficiency-notice process before conducting the tie-breaker lottery.[7] (*Id.*)

In July 2021, during the Department's deficiency-notice process for the first 75 licenses, the Illinois General Assembly amended the Cannabis Act. *See* Act of July 15, 2021, 2021 Ill. Legis. Serv. P.A. 102-98 (West). The amendment codified the tie-breaker lottery for the original 75 licenses (now called the "Tied Applicant Lottery") and established two additional lotteries, each for 55 more licenses: the "Qualifying Applicant Lottery" and the "Social Equity Justice Involved

---

[5]     An applicant could seek more than one license by paying multiple fees. *See* 410 ILCS 705/15-25(d)(1). The Department stated that 937 unique *applicants* applied by January 2020, but it did not specify how many licenses those applicants sought in total.

[6]     *See* Ill. Dep't of Fin. & Prof'l Reg., *Top Scoring Applicants by BLS Region* (Sept. 3, 2020), https://idfpr.illinois.gov/Forms/AUC/2020%20Top%20scorer%20document.pdf.

[7]     The deficiency-notice process allowed applicants who did not receive a perfect score to "(a) submit an amended application exhibit; (b) request that the Department review any original application exhibit for potential scoring errors or inconsistencies (e.g., the same applicant submitted the identical supporting document for the same exhibit on multiple applications but did not receive the same score on each exhibit); or (c) do nothing and keep the current score on that exhibit." *See* Ill. Dep't of Fin. & Prof'l Reg., *Conditional Adult Use Dispensing Organization License Supplemental Deficiency Notice Process* (Sept. 22, 2020), https://idfpr.illinois.gov/Forms/ AUC/Supplemental%20Deficiency%20Notice%20Process.pdf.

Lottery."[8]  *See* 410 ILCS 705/15-30.20, 15-35, 15-35.10.  Notably, the amendment did not invite new applications.  *See id.* §§ 15-35(a), 15-35.10(a).  The Department's website confirms that all three lotteries were limited to applicants who had previously applied by the January 2020 deadline.[9]

To participate in the Qualifying Applicant Lottery, an applicant needed to receive at least 213 points under the statutory criteria (i.e., 85% of the 250 available points) and to meet one of the three definitions of a "Social Equity Applicant" (each of which requires Illinois residency, among other things). *Id.* § 15-35; *id.* § 1-10 (defining "Qualifying Applicant").  To participate in the Social Equity Justice Involved Lottery, an applicant also needed to receive at least 213 points, and specifically needed to meet the first or second definitions of a "Social Equity Applicant" (either of which requires, among other things, Illinois residency).  *Id.* § 15-35.10; *id.* § 1-10 (defining "Qualifying Social Equity Justice Involved Applicant").  And, as noted, the Tied Applicant Lottery was limited to applicants with perfect scores.  Because 55 statutory points were available only to Illinois residents, nonresidents could receive, at most, 195 out of the 250 points available.  The three lotteries for the first 185 licenses were, as a result, limited to Illinois residents who had applied by January 2020.

Later in July 2021, the Department concluded its deficiency-notice process for the first 75 licenses and began conducting the three lotteries.[10]  (Def.'s Resp. at 8.)  The Qualifying Applicant

---

[8]    The 2021 amendment to the Cannabis Act also firmed up the details for the forthcoming 2022 lottery, which Plaintiffs likewise challenge.  *See infra* Section II.

[9]    *See* Ill. Dep't of Fin. & Prof'l Reg., *Frequently Asked Questions* (last visited June 1, 2022), https://idfpr.illinois.gov/Forms/AUC/FAQs%20for%20QAL%20SEJIL%20and%20 TAL.pdf ("Any references to 'applicants' or 'applicant groups' mean entities that applied between December 10, 2019 and January 2, 2020.  The State is not currently accepting new applications for cannabis dispensary licenses.").

[10]    The same month, in July 2021, a state court enjoined the Department's issuance of licenses.  (*See* Def.'s Status Report on State Court Litig. [24] at 1 (citing *WAH Grp., LLC v. Ill. Dep't of Fin. & Prof'l Reg.*, No. 2020 CH 5759 (Ill. Cir. Ct. Cook Cnty.).)  But on May 27, 2022, while this motion was pending, the state court lifted that stay to the extent that it prohibited the

Lottery occurred on July 29; the Social Equity Justice Involved Lottery occurred on August 5; and the Tied Applicant Lottery occurred on August 19.[11] (*Id.*) The Department announced the results of these three lotteries, allocating 185 licenses, in a final administrative decision on September 3, 2021.[12] (*Id.*)

### III. Ongoing State Court Litigation Over the 2021 Lotteries

Several applicants promptly filed state-court lawsuits challenging the Department's September 2021 decision under the Illinois Administrative Review Law (ARL). (*See* Def.'s Resp. at 9.) *See also* 410 ILCS 705/15-175 (providing for review of the Department's final decisions under the ARL); 735 ILCS 5/3-103 (imposing a 35-day deadline for such challenges). These claims and other related cases were consolidated before Judge Celia Gamrath of the Circuit Court of Cook County. *See In re Cannabis Dispensary Litig.*, No. 21 CH 3730 (Ill. Cir. Ct. Cook Cnty.).[13]

The claims in the case before Judge Gamrath, brought by some 70 petitioners, vary in substance, but the state petitioners generally allege that their applications were scored improperly, resulting in their being "excluded from one or more of the lotteries." *See* Order

---

Department from issuing the 2021 licenses. (*See* Def.'s Second Status Report on State Court Litig. [25] at 1.)

[11] Ill. Dep't of Fin. & Prof'l Reg., *Notice of Conditional Adult Use Cannabis Dispensing Organization Lotteries* (July 15, 2021), https://idfpr.illinois.gov/Forms/AUC/IDFPR%20Notice%20 of%20Lottery%20Dates.pdf.

[12] Ill. Dep't of Fin. & Prof'l Reg., *Final Admin. Decision* (Sept. 3, 2021), https://idfpr.illinois.gov/Forms/AUC/Final%20Administrative%20Decision.pdf.

[13] Although this court does not have ready access to the state court docket, the parties have provided some of the relevant orders. (*See, e.g.*, Order, *High Haven Dispensary, LLC v. Ill. Dep't of Fin. & Prof'l Reg.*, No. 127703 (Ill. Sup. Ct. Oct. 18, 2021) (consolidating several cases), Ex. B to Def.'s Resp. [20-2]; Order, *WAH Grp. LLC v. Ill. Dep't of Fin. & Prof'l Reg.*, No. 20 CH 5759 (Ill. Cir. Ct. Cook Cnty. Nov. 29, 2021) (consolidating several more cases), Ex. A to Def.'s Resp. [20-1].)

Granting Limited Remand at 3, *In re Cannabis Dispensary Litig.*, No. 21 CH 3730 (Ill. Cir. Ct. Cook Cnty. May 17, 2022) (briefly summarizing the claims).[14]

On March 23, 2022, while the state cases were pending, Plaintiffs filed their complaint in this court, along with a motion for a temporary restraining order and preliminary injunction. (*See* Compl. for Declaratory and Injunctive Relief [1]; Pls.' Emergency Mot. for a TRO & Prelim. Inj. [6].) In their motion, Plaintiffs asserted that Judge Gamrath was reportedly on the verge of issuing a significant ruling. If the Department were allowed to move forward with issuing licenses that had been allocated in the 2021 lotteries, Plaintiffs said, they would be irreparably harmed because their opportunity to obtain a license (the total number of which is limited by statute) would be diminished. At an initial hearing the day after Plaintiffs filed their motion, the Department stipulated that it will not issue any licenses pending further order of this court and of the state court that previously stayed such issuance.[15] (*See* Def.'s Second Status Report on State Court Litig. [25] at 1–2.)

On May 17, 2022, while this motion was pending, Judge Gamrath issued a ruling partially remanding the matter to the Department with directions to run corrective lotteries. *See* Order Granting Limited Remand at 7–8, *In re Cannabis Dispensary Litig.*, No. 21 CH 3730 (Ill. Cir. Ct. Cook Cnty. May 17, 2022).[16] Under the order, state petitioners who claim that they were improperly excluded from a 2021 lottery will be able to participate in a corrective lottery, subject

---

[14]     The Department points out that neither Plaintiff has sought to intervene in this state proceeding. (Def.'s Resp. at 9.) But it is not clear that they would have any right to do so, at least under the ARL. As discussed, Plaintiffs never submitted license applications by the January 2020 deadline, so they were not parties to the Department's final administrative decision regarding the 2021 lotteries. See 735 ILCS 5/3-102 (suggesting that judicial review under the ARL is available only to "parties to the proceeding before the administrative agency").

[15]     On May 27, 2022, the state court lifted that stay to the extent that it prohibited the Department from issuing the 2021 licenses. (*See* Def.'s Second Status Report on State Court Litig. at 1.)

[16]     The Department attached Judge Gamrath's remand order to a status report that it filed with this court the next day. (Ex. 1 to Def.'s Status Report on State Court Litig. [24-1].)

to the same odds (on a per-entry basis) as the participants in the original lotteries were.[17]  The petitioners selected in one of those corrective lotteries (i.e., those who win) will be entitled to a license only if they can *then* establish the merits of their claim that they were, in fact, improperly excluded from a lottery in 2021.  Judge Gamrath recognized that this result is unusual—the court directed the Department to conduct corrective lotteries before the court has heard the merits of petitioners' claims—but explained that the case demanded a "swift resolution, one that is malleable based on the law and in equity, to safeguard all parties' interests."

Under Judge Gamrath's order, the Department must begin running the corrective lotteries by June 24, 2022, and must complete the process no later than July 15, 2022.  In the meantime, the state court will "maintain[] concurrent jurisdiction with the administrative agency and will continue to oversee the Department's filing of the administrative record and set briefing schedules on the merits of Petitioners' claims, which is independent of the randomized lottery process."

Additionally, there has been an important recent development in state court that is apparently separate from the consolidated cases.  On May 27, 2022, in *WAH Group, LLC v. Illinois Department of Financial & Professional Regulation*, the Illinois Circuit Court partially lifted the stay that was imposed in July 2021.[18]  (*See* Def.'s Second Status Report on State Court Litig. at 1 (citing *WAH Grp. LLC v. Ill. Dep't of Fin. & Prof'l Reg.*, No. 20 CH 5759 (Ill. Cir. Ct. Cook Cnty.).) While this court has been given little information about that new order, it understands that the Department is now free to proceed with issuing the 185 licenses that were allocated in the 2021

---

[17]    Recall that an applicant could secure multiple lottery entries by paying multiple application fees.  *See* 410 ILCS 705/15-25(d)(1).

[18]    The plaintiffs *WAH Group* filed their original complaint in September 2020, challenging the Department's decision that a perfect score of 252 points was required to participate in the lottery for the first 75 licenses.  *See* Pl. WAH's Resp. in Obj. to Defs.-Pet'r's Mot. to Transfer and Consolidate Cases Under Ill. Sup. Ct. Rule 384 at 1–2, 4–5, *High Haven Dispensary, LLC v. Ill. Dep't of Fin. & Prof'l Reg.*, No. 21 CH 3730 (Ill. Sup. Ct. Oct. 5, 2021), https://tinyurl.com/3n8m3875.  On July 28, 2021, Judge Moshe Jacobius stayed the Department's issuance of licenses until further order of the court.  *Id.* at 7.  As the Department reported, that stay was recently lifted to allow the issuance of the 2021 licenses.  (Def.'s Second Status Report on State Court Litig. at 1.)

lotteries, subject only to its commitment not to do so pending further order of this court. (*See id.* at 1–2 (describing the Department's stipulation in this case).)

## IV.     2022 Lottery

The 2021 amendment to the Cannabis Act also provided for issuance of a fourth batch of licenses. Specifically, the statute now directs the Department to issue "at least 50" additional licenses on or before December 21, 2022. *See* 410 ILCS 705/15-35.20(c). While the Department has not finalized the procedures and requirements for this upcoming batch of licenses, it issued a proposed rule in the *Illinois Register* just days after Plaintiffs filed this motion. *See* 46 Ill. Reg. 5,127 (Mar. 25, 2022). Under the proposed rule, the Department will issue another 55 licenses in a lottery held sometime in 2022. *Id.* at 5,137–38.

To be eligible to participate in the 2022 lottery, as currently proposed, an applicant must satisfy one of two options. *Id.* at 5,140–41. "Option 1" requires Illinois residency and at least 51% ownership and control by one or more individuals who either (1) "have resided for at least 5 of the preceding 10 years in a [Disproportionately Impacted Area]"; (2) "have been arrested for, convicted of, or adjudicated delinquent for any offense that is eligible for expungement under the Act"; or (3) "[are] members of an impacted family." *Id.* at 5,141. "Option 2" does not require Illinois residency; it does require, however, that an applicant satisfy four of the following seven criteria[19]:

(i)    Be "at least 26% owned or controlled" by individuals who satisfy one of the three options given in Option 1;

(ii)   Commit for at least two years to "operat[ing] the dispensary in a [Disproportionately Impacted Area]";

(iii)  Commit for at least two years to purchasing "at least 25% of all cannabis products offered to consumers" from infusers or growers licensed as Social Equity Applicants;

---

[19]    To be more specific, the applicant must satisfy "any combination of the 4 or a single criterion 4 times." 46 Ill. Reg. at 5,141.

(iv)    Commit for at least two years to purchasing "at least 30% of the total amount of its contracts on subcontractors and vendors that are registered" under Illinois' Business Enterprise for Minorities, Females, and Persons with Disabilities Act;[20]

(v)    Commit for at least two years to establishing or facilitating "a cannabis industry training or education program at an Illinois Community College";

(vi)    Within 60 days of issuance of the conditional license, pay $250,000 "as an unrestricted grant" to another cannabis business licensed as a Social Equity Applicant or Option 1 applicant;

(vii)    Within 60 days of issuance of the conditional license, pay $500,000 to the "Cannabis Business Development Fund."[21]

*Id.* at 5,141–43.

The Department has stated publicly that it "anticipates opening the conditional license application window during the late summer or early fall of 2022, depending on when the rules become permanent." Ill. Dep't of Fin. & Prof'l Reg., Press Release, *Pritzker Administration to Propose New, Simplified Approach to Cannabis Dispensary Applications* (Mar. 15, 2022), https://idfpr.illinois.gov/Forms/AUC/IDFPR%20Cannabis%20Rule%20Making%20Process%20 Press%20Release.pdf (hereinafter "2022 Press Release"). Under Illinois law, the proposed rule will not be finalized until there has been public notice as well as approval by the Joint Committee on Administrative Rules. 5 ILCS 100/5-6, 5-10. (*See also* Def. Resp. at 16.) As of the issuance of this opinion, it does not appear that the proposed rule has been finalized.

## DISCUSSION

Plaintiffs request two forms of injunctive relief. First, they ask the court to enjoin the Department from issuing any of the 185 licenses that were allocated through the three 2021 lotteries. Second, Plaintiffs ask the court to enjoin the Department from enforcing the Cannabis Act's residency requirements and any other residency requirements going forward. Plaintiffs

---

[20]    It does not appear that registration under this Act requires Illinois residency. *See Business Enterprise Program: Certification Overview*, ILL. COMM'N ON EQUITY & INCLUSION (last visited June 1, 2022), https://cei.illinois.gov/business-enterprise-program/get-certified.html.

[21]    The Cannabis Act created this fund to provide low-interest loans, grants, and other assistance to Qualified Social Equity Applicants. *See* 410 ILCS 705/7-10.

frame these requests as two sides of the same coin, and both parties have generally analyzed the requests together.  Because the court finds that the 2021 lotteries generate different concerns than future lotteries, however, it analyzes them separately.

I.      **Enjoining the Issuance of the 2021 Lottery Licenses**

First, Plaintiffs ask the court to enjoin the Department from issuing the 185 licenses that were allocated through the three 2021 lotteries.  In response, the Department has raised a variety of threshold arguments before discussing the familiar preliminary injunction test.  Specifically, the Department contends that Plaintiffs lack standing with respect to these 185 licenses because they never applied for one and because they seek relief on behalf of nonparties; that Plaintiffs failed to name necessary parties under Federal Rule of Civil Procedure 19; that the requested relief would violate the Anti-Injunction Act in light of the ongoing state case; that this court should abstain from hearing Plaintiffs' claims in the interest of equity, comity, and federalism; that Plaintiffs' request for relief is time-barred; and that a federal court cannot exercise its equitable power to facilitate the sale of cannabis because cannabis is illegal under the federal Controlled Substances Act.  In addition to those threshold arguments, the Department argues that Plaintiffs cannot establish a likelihood of success on the merits of their Commerce Clause challenge to the Cannabis Act's residency requirements; that Plaintiffs had an adequate remedy at law; and that the balance of harms favors denying the requested relief.

Below, the court finds, first, that Plaintiffs do have standing.  It then explains that although no single argument by the Department is conclusive on its own, together the arguments show why equitable relief (here, an injunction) is unwarranted.  Plaintiffs had ample time and opportunity to challenge the Cannabis Act's residency-related criteria sooner, but they waited until the eleventh hour to file suit.  So timed, their request threatens to completely disrupt a complicated administrative and judicial process that has been taking place for several years and in which numerous third parties have participated and invested financially.  Moreover, Plaintiffs' Commerce Clause challenge arises in a novel and unsettled area of law.  The merits of this challenge aside,

13

granting their unjustifiably tardy and sweeping request would not be an appropriate exercise of this court's equitable powers. The court declines to enjoin the Department from issuing the 185 licenses that were allocated through the three 2021 lotteries.

### A. Standing

The first threshold issue here is whether Article III's case-or-controversy requirement is satisfied. Plaintiffs, as the party invoking jurisdiction, bear the burden of establishing standing. *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020). At the pleadings stage, this requires well-pleaded factual allegations plausibly suggesting each element of standing. *Id.* Those familiar elements are (1) an injury in fact that is (2) fairly traceable to the challenged conduct and (3) likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

### 1. Plaintiffs' Failure to Apply for a License

The Department first claims that because Plaintiffs never applied for the 2021 lotteries, they did not suffer an injury in fact. An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A "generally available grievance about government," unconnected to a concrete harm, does not suffice. *Lujan*, 504 U.S. at 573. The Department essentially argues that unless Plaintiffs had applied for and been denied a license, they have alleged only a generalized grievance about licenses awarded under the 2021 lotteries. In the court's view, this argument sweeps too broadly.

"When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group . . . the 'injury in fact' is the inability to compete on an equal footing in the . . . process, not the loss of [the benefit]." *Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). In a long line of cases, the Supreme Court has made clear that to establish such an injury, a plaintiff need only show that he is "able and ready" to compete for the benefit.

14

*Id.*; *see also Carney v. Adams*, 141 S. Ct. 493, 500 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995). Most recently, in *Carney v. Adams* (a case not discussed by the parties), the Supreme Court considered a political independent's challenge to Delaware's judicial selection criteria, which requires judges on three of its five courts to be members of major political parties. The Court explained that to prove the alleged injury—being prevented from "having his judicial application considered"—the plaintiff "must at least show that he is likely to apply to become a judge in the reasonably foreseeable future if Delaware did not bar him because of political affiliation," which he could only show "if he is able and ready to apply." *Carney*, 141 S. Ct. at 499–500 (quotation marks omitted). To determine this, the Court considered the summary judgment record, which revealed only a "few words of general intent [from plaintiff]—without more and against . . . contrary evidence." *Id.* at 501–02. Because this did not demonstrate "an intent that is concrete," the plaintiff lacked standing. *Id.* at 502.

Plaintiffs Finch and Toigo have done more; they have adequately pleaded that they are "ready and able" to apply for a conditional license, should the court enjoin the enforcement of the allegedly unconstitutional residency criteria and the issuance of licenses allocated under those criteria. In declarations, both Plaintiffs state that they would apply for a license if the residency requirements were enjoined. (Finch Decl. ¶ 8; Toigo Decl. ¶ 7.) Furthermore, those allegations are plausible: Toigo is the shareholder of a Missouri cannabis company, has actively invested in cannabis-related businesses for years, and has applied for cannabis-related licenses in multiple states. (Toigo Decl. ¶¶ 3–4.) *See Northeastern Florida*, 508 U.S. at 666, 668–69 (holding that plaintiff contractors established standing to challenge the city's race-conscious set-aside program where they alleged that they "regularly bid on construction contracts" and "would have" bid on the set-aside contracts). Though Finch lacks this experience, he ended his 21-year military career and moved to Chicago "to make a career change to the cannabis industry in Illinois." (Finch Decl. ¶ 4.) Additionally, Finch alleges that he did in fact "attempt[] to apply for a conditional Illinois

dispensary license" sometime in 2019, but "quickly discovered . . . that [his] application was doomed because [he] was not an Illinois resident at the time." (*Id.* ¶ 5.) Toigo similarly states that he "would have applied" for a conditional license, but understood it was "futile," as "Illinois had required state residency to participate in one of the three lotteries held in 2021." (Toigo Decl. ¶ 5.)

The Department does not directly rebut these assertions. Instead, it contends that the lack of a formal application is dispositive. The court disagrees; this fact is simply one consideration in the "concrete intent" analysis. *See Carney*, 141 S. Ct. at 501 (considering plaintiff's failure to apply for a judgeship when he was eligible—i.e., registered with a major political party—as one factor that weighed against finding "an actual desire to become a judge"). On the facts of this case, Plaintiffs' failure to submit an application does not defeat a finding of intent, as such an application would have been futile. *See id.* at 503 ("[O]ur precedents have also said that a plaintiff need not 'translat[e]' his or her "desire for a job . . . into a formal application' where that application would be merely a 'futile gesture.'" (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977)). Under the original Cannabis Act, applications for the 75 licenses were due by January 1, 2020, under standards that made some 22% of the statutory points available only to Illinois residents. In September 2020, the Department announced that more than 75 applicants had received a perfect score, meaning that Illinois residents were the only applicants eligible for the tie-breaker lottery. The July 2021 amendment created two additional lotteries for 110 more licenses, but these lotteries were likewise open only to Illinois residents who had applied by the original deadline. Thus, under the statutory criteria in place in 2019, when Finch went through the application process, he was, at the very least, comparatively disadvantaged to Illinois residents. And though Finch is less than specific on how he "discovered" the futility of applying, this conclusion was eventually proven true. In any event, both Plaintiffs were locked out of the two additional lotteries, which the state opened only to Illinois residents who had already applied by January 2020—limitations that excluded nonresidents (like Toigo) or

later-arriving Illinois residents (like Finch).  Plaintiffs' failure to submit an application for these additional licenses does not preclude standing.

Caselaw cited by the Department does not compel a different result.  In *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67 (1972), the Supreme Court held that the plaintiff lacked standing to challenge a club's discriminatory membership policy "since he never sought to become a member."  The Court did not otherwise consider whether the plaintiff (who arrived at the club as someone's guest and was refused food and drink service) intended to become a member.  *Id.* at 165.  Similarly, in *Allen v. Wright*, 468 U.S. 737 (1984), parents of black children who attended public schools lacked standing to challenge the tax-exempt status of racially discriminatory private schools—but plaintiffs did not allege "that their children have ever applied *or would ever apply* to any private school."  *Id.* at 746 (emphasis added).  And *Freedom from Religion Foundation, Inc. v. Lew*, 773 F.3d 815, 819 (7th Cir. 2014), concerned the unique context of the Establishment Clause, which primarily protects noneconomic spiritual interests and makes it particularly difficult to identify a concrete injury.  To challenge a tax exemption that was conditioned on religious affiliation, the plaintiffs relied on one accepted way of showing standing in Establishment Clause cases: that "they have incurred a cost or been denied a benefit."  *Id.* (quoting *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 130 (2011)).  Without applying for that exemption, plaintiffs could not show the denial of a benefit.  But such a showing is not necessary in a case like this one, where the alleged injury is being denied consideration on an equal footing with others.  Seventh Circuit caselaw confirms that, in this context, there is no application requirement.  *See Black Bear Sports Grp., Inc. v. Amateur Hockey Ass'n of Ill., Inc.*, 962 F.3d 968, 971 (7th Cir. 2020) (for-profit plaintiff had standing to bring an antitrust challenge against the defendant's rule limiting membership to nonprofits, even though plaintiff never asked for admission); *Doe v. Holcomb*, 883 F.3d 971, 978 (7th Cir. 2018) (non-citizen plaintiff had standing to challenge a statute requiring name-change petitioners to be U.S. citizens, even though

he never submitted a petition). Plaintiffs adequately alleged an injury in fact—the inability to compete on equal footing for the 185 licenses allocated in 2021.

### 2. Relief on Behalf of Nonparties

The Department additionally argues that Plaintiffs lack standing to seek injunctive relief on behalf of nonparties. This type of injunction—where relief extends beyond the plaintiff—is also called a "universal" or "nationwide" (here, statewide) injunction. *See City of Chicago v. Barr*, 961 F.3d 882, 913 n.7 (7th Cir. 2020).

To support its argument that Plaintiffs lack standing to seek a universal injunction, the Department relies primarily on *McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997). In *McKenzie*, the plaintiff (a building owner) challenged a city program that permitted the demolition of certain buildings. *Id.* at 554–55. The Seventh Circuit reversed the district court's injunction halting the program, explaining that the plaintiff's "stake concerns only those buildings in which it has a financial interest." *Id.* at 555. This interest, like the interests of non-plaintiff building owners, could "be protected by an injunction that prevents the City from demolishing their properties," and so the plaintiff could not seek "relief that benefits third parties." *Id.* But the Seventh Circuit acknowledged that, in some cases, federal courts "may overhaul a statutory program . . . in reapportionment and school desegregation cases, for example, it is not possible to award effective relief to the plaintiffs without altering the rights of third parties." *Id.* The Department's reliance on this language from *McKenzie* is not persuasive for several reasons.

First, while recognizing that an injunction that extends to nonparties can "present real dangers" and is "appropriate only in rare circumstances," the Seventh Circuit recently affirmed that federal courts do have authority to grant such relief. *City of Chicago v. Barr*, 118 F.3d at 916. In *City of Chicago v. Barr*, the district court had granted a nationwide injunction against the enforcement of unconstitutional conditions on federal grants for state and local law enforcement. *Id.* at 886. In considering this injunction, the Seventh Circuit did not ask whether the City of Chicago had *standing* to pursue nationwide relief, but instead focused on the *propriety* of granting

it. And the Seventh Circuit concluded that a "more narrow" approach was available, because the complicated statutory formula for calculating grant awards rendered localities' and states' awards "interrelated and interdependent." *Id.* at 920, 929. As a practical matter, therefore, complete relief to Chicago (awarding its grant absent the unlawful conditions) required "the elimination of the conditions program-wide." *Id.* at 930. Such an award was permissible under a long line of cases holding that "a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties." *Id.* at 920–21 (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); and *McKenzie*, 118 F.3d at 555); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (in two prior malapportionment cases, "the only way to vindicate an individual plaintiff's right to an equally weighted vote was through [statewide relief]"). Because the Seventh Circuit decided *City of Chicago v. Barr* on a narrower ground, it did not squarely determine whether Chicago had standing to seek a universal injunction. But the opinion suggests that this issue is properly considered at the second step (tailoring relief) not the first step (can plaintiffs enter federal court).

Second, to the extent plaintiff's requested relief impacts a federal court's ability to entertain suit, this court is satisfied that Plaintiffs have established standing to seek relief that impacts non-parties. As *City of Chicago v. Barr* and *McKenzie* make clear, plaintiffs have standing to request individualized relief, even where it would incidentally affect third parties. In *McKenzie*, it was possible to grant relief without such incidental effect: Because the demolition of one building does not affect any other building, each owner could simply request an individual injunction without affecting other owners. But in *City of Chicago v. Barr*, the interconnectedness of the federal grants meant that a grantee could not request an individual injunction without affecting other grantees. Here, too, any individualized relief would inherently affect the rights of third parties. The Cannabis Act provides a finite number of licenses: 185 awarded from the 2021 lotteries, an expected 55 to be awarded in 2022, and a maximum of 500 full-status licenses to be awarded ever. Changing any one applicant's odds necessarily affects every other applicant's odds. Indeed, the

19

Department's suggestion that Plaintiffs have standing only to seek licenses for themselves, subject "to lottery odds similar to the original lotteries," demonstrates this principle. (Def.'s Resp. at 15.) If all 185 licenses from the 2021 lotteries are formally issued, there will be 185 fewer licenses that Plaintiffs can compete for in the future; the Department would need to artificially increase their odds to compensate for that fact, decreasing other applicants' odds.

The court acknowledges that Plaintiffs have been less than forthcoming about the details of their hypothetical odds; for example, they have not identified the specific Illinois regions in which they would seek licenses—and perhaps only the rights of other applicants in those regions need be affected to provide Plaintiffs complete relief. But no matter the region, nonresidents (including Plaintiffs) were locked out of the 185 licenses, and therefore suffered an injury in fact. *See Gill*, 138 S. Ct. at 1931–32 (where plaintiffs' vote dilution claim "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight," plaintiff voters living in "packed" or "cracked" districts had standing). And while the "remedy must be tailored to redress the plaintiff's particular injury," *id.* at 1934, the court considers this when determining the scope of any equitable relief it might grant.

Before turning to the merits, the court briefly discusses the Department's remaining argument about nonparties: that all entities who were allocated a conditional license in the 2021 lotteries are necessary parties under Federal Rule of Civil Procedure 19. Rule 19 requires joinder of any party who will not deprive the court of subject matter jurisdiction and who, as applicable here, "claims an interest relating to the subject of the action," where the interested party's absence will "as a practical matter impair or impede the person's ability to protect the interest." FED. R. CIV. P. 19(a)(1)(B)(i). "As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *J.P. Morgan Chase Bank, N.A. v. McDonald*, 760 F.3d 646, 653 (7th Cir. 2014) (quoting *Washington v. Daley,* 173 F.3d 1158, 1167 (9th Cir.1999)). Assuming that the entities who were allocated conditional licensees have an interest in this lawsuit, that interest is

identical to the Department's: upholding the result of the 2021 lotteries. The Department offers no reason why it cannot adequately represent this interest on behalf of these individuals. *Compare id.* ("To the extent the employees have an interest in the present lawsuit, it is identical to their employer's: an end to the arbitration. This interest will therefore be protected whether or not the individual employees are parties to this suit.")*, with Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*, 932 F.3d 843, 854–56 (9th Cir. 2019) (an existing party cannot adequately represent an absent party where their interests "differ[] in a meaningful sense"). With these threshold issues addressed, the court turns to Plaintiffs' preliminary injunction request.

### B. Preliminary Injunction Standard

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)). "To obtain a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits, and that traditional legal remedies would be inadequate, such that it would suffer irreparable harm without the injunction." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). "If a plaintiff makes such a showing, the court then must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). In balancing the harms, a district court must consider the "public interest," which includes "people and institutions that are not parties to the case." *Cassell*, 990 F.3d at 545. The Seventh Circuit follows a "sliding scale" approach: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018) (internal quotation marks omitted).

### 1. Likelihood of Success on the Merits

The Commerce Clause authorizes Congress "to regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court has long interpreted this

affirmative grant of federal power to contain a corresponding negative command, known as the dormant Commerce Clause. *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). In order to "preserv[e] a national market for goods and services," the dormant Commerce Clause prohibits states from enacting "protectionist measures" or "laws that unduly restrict interstate commerce." *Id.* The Seventh Circuit employs a three-tiered approach to determine whether a state law runs afoul of the dormant Commerce Clause: (1) A law that facially discriminates against interstate commerce is "almost per se unconstitutional," and passes muster only "if it serves a legitimate governmental interest and there is no reasonable non-discriminatory means of furthering that interest"; (2) a seemingly neutral law that "effectively operates as an embargo on interstate commerce" is treated like a facially discriminatory law; and (3) a law that "only incidentally burdens interstate commerce" is analyzed under the balancing test from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). *Regan v. City of Hammond*, 934 F.3d 700, 703 (7th Cir. 2019).

The 2021 lotteries fall into the first category. To participate in the tie-breaker lottery, an applicant needed to have a perfect score of 252 points, 55 of which were available only to Illinois residents. To participate in either the second or third lotteries, an applicant needed to have at least 213 points, a threshold that could not be met without Illinois residency. Similar—or less discriminatory—licensing schemes have been found likely to violate the dormant Commerce Clause's near "per se" prohibition on facially discriminatory laws. *See Attitude Wellness, LLC v. Village of Pinckney*, No. 21-CV-12021, 2022 WL 1050305, at *3–4 (E.D. Mich. Apr. 7, 2022) (about 18% of application points available only to residents); *Northeast Patients Grp. v. Maine Dep't of Admin. & Fin. Servs.*, 554 F. Supp. 3d 177, 180, 183 (D. Me. 2021) (officers and directors of medical dispensaries must be residents); *Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 991 (W.D. Mo. 2021) (in a case brought by one of the Plaintiffs here, finding standing to challenge a one-year residency requirement for applicants); *NPG, LLC v. City of Portland*, No. 2:20-CV-00208-NT, 2020 WL 4741913, at *2, 11 (D. Me. Aug. 14, 2020) (of the 34 available

points, five are available only to residents and four to prior Maine business licensees). *But see Original Invs., LLC v. State*, 542 F. Supp. 3d 1230, 1233–35 (W.D. Okla. 2021) (declining to reach the merits of Oklahoma's residency requirements because equitable relief would "facilitate activity that is illegal under federal law").

To justify the 2021 licensing scheme, the Department argues that it combats the harmful effect of Illinois' past drug laws by encouraging individuals and communities disproportionately affected by these laws to participate in the cannabis industry. (Def.'s Resp. at 30–31.) Assuming this is a legitimate government interest (which Plaintiffs dispute), the Department does not explain how the categorical exclusion of nonresidents is narrowly tailored to achieve this end. Instead, the Department apparently believes that a lower standard of scrutiny applies; the Department cites cases applying the *Pike* balancing test, which asks whether "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981) (quoting *Pike*, 397 U.S. at 142). But that balancing test applies only where the statute "does not discriminate between interstate and intrastate commerce," and instead "regulates evenhandedly." *Id.* at 471–72. Barring nonresidents from participating in the 2021 lotteries is not evenhanded or nondiscriminatory, and so the Department must meet the high burden of narrow tailoring. It has failed to do so.

Perhaps realizing this, the Department makes several other arguments premised on the unique circumstance of this challenge to the cannabis dispensary scheme—namely, that the manufacture, distribution, and possession of marijuana remains unlawful under the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* According to the Department, this means that (1) the dormant Commerce Clause does not apply, and (2) this court cannot award injunctive relief. The court is not persuaded by either argument.

First, application of the dormant Commerce Clause: Because Congress has exercised its commerce power to prohibit cannabis, the Department contends, that power is not dormant, and Illinois may restrict the interstate cannabis market however it pleases. This appears to be a

misstatement of the doctrine.  It is well established that Congress may exercise its commerce power to "confer[] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy."  *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980).  Courts therefore recognize an exception to the dormant Commerce Clause where the "state and local laws [are] expressly authorized by Congress."  *Hirst v. Skywest, Inc.*, 910 F.3d 961, 967 (7th Cir. 2018); *see also Northeast Bancorp, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 472 U.S. 159, 174 (1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause.").  But for this exception to apply, Congress's direction must be "unmistakably clear."  *Maine v. Taylor*, 477 U.S. 131, 139 (1986) (quoting *South-Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91 (1984)).  It is not enough to simply regulate on the matter, without clearly authorizing the states' ability to restrict interstate commerce.[22]  The Department points to no provision in the CSA conferring regulatory

---

[22]     The premise of the Department's argument—that the dormant Commerce Clause applies only when Congress has not regulated the matter—rests on cherry-picked language from Supreme Court decisions.  For instance, the Department points to language from *Tennessee Wine*, 139 S. Ct. at 2465, that "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue."  But this statement arose in the Court's discussion of the history of the Commerce Clause, and represents an older (and since rejected) view of the dormant Commerce Clause.  For many years, it was not clear whether the "long recognized" constitutional restrictions on the states' ability to regulate interstate commerce was "predicated upon the implications of the commerce clause itself, or upon the presumed intention of Congress, where Congress has not spoken."  *Southern Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 768 (1945) (citations omitted).

The above-cited statement from *Tennessee Wine* is supported by a "cf." citation to two Supreme Court cases from the late 1800s, which struck down state laws regulating imported liquor and rested on this latter theory—that congressional silence should be understood as a statement of intent to restrict the states' power.  *See Leisy v. Hardin*, 135 U.S. 100, 109 (1890) ("Whenever, however, a particular power of the general government is one which must necessarily be exercised by it, and congress remains silent . . . the only legitimate conclusion is that the general government intended that power should not be affirmatively exercised, and the action of the states cannot be permitted to effect that which would be incompatible with such intention."); *Bowman v. Chicago & Northwestern R. Co.*, 125 U.S. 465, 485 (1888) ("[Congress's] non-action, in such cases, with respect to any particular commodity or mode of transportation, is a declaration of its purpose that the commerce in that commodity, or by that means of transportation, shall be free.").

This silence or intent theory, under which congressional inaction would be a prerequisite to dormant Commerce Clause restrictions, did not carry the day.  As recently as *Tennessee Wine*

authority on the states with respect to cannabis—nor could it, as the statute wholesale prohibits any type of cannabis industry. *See NPG*, 2020 WL 4741913, at *10 ("[T]he Act nowhere says that states may enact laws that give preference to in-state economic interests."); *accord Northeast Patients Grp*, 554 F. Supp. 3d at 185 n.11.

The Department seizes upon this—that the CSA completely prohibits cannabis—and broadly argues that because marijuana is federally illegal, it is not an item of "interstate commerce." In support, the Department cites only *Predka v. Iowa*, 186 F.3d 1082, 1083 (8th Cir. 1999), which considered a habeas petitioner's Commerce Clause challenge to his statute of conviction, an Iowa law imposing a tax on controlled substances. The Eighth Circuit agreed with the conclusion of the Iowa Supreme Court, which had previously rejected the defendant's argument: "[P]roperty which is subject to seizure under the state's police power cannot be regarded as a proper article of commerce protected by the Commerce Clause." *Id.* at 1084 (quoting *State v. Predka*, 555 N.W.2d 202, 213 (Iowa 1996)). In reaching this conclusion, the Eighth Circuit noted that marijuana is illegal contraband under Iowa law, and appeared to rest its decision on Iowa's police power to prohibit "things which in their nature are so deleterious or injurious to the lives and health of the people as to lose all benefit of protection as articles or things of commerce, or to be able to claim it only in a modified way." *Id.* (quoting *Crutcher v. Commonwealth*, 141 U.S. 47, 60 (1891)); *see Ziffrin, Inc. v. Reeves*, 308 U.S. 132, 139 (1939) ("The [Kentucky] statute declares whiskey removed from permitted channels contraband subject to immediate seizure. This is within the police power of the state; and property so circumstanced cannot be regarded as a proper article of commerce."). To the extent this reasoning still holds water in Commerce Clause cases, it does not have any force here. *See City of Philadelphia v.*

---

itself, the Court concluded that "[i]n light of . . . history and our established case law . . . the Commerce Clause by its own force restricts state protectionism." 139 S. Ct. at 2461. These restrictions do not disappear as soon as Congress has legislated on a matter. Rather, only where Congress has affirmatively authorized state protectionism through legislation does the dormant Commerce Clause exit the picture.

*New Jersey*, 437 U.S. 617, 622 (1978) (explaining that "[a]ll objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset," and that previous cases "held simply that because the articles' worth in interstate commerce was far outweighed by the dangers inhering in their very movement, States could prohibit their transportation across state lines"); *cf. State v. Alangcas*, 134 Haw. 515, 536–37, 345 P.3d 181, 202–03 (2015) (collecting cases holding that state statutes penalizing the transmission of sexual material to lure minors did not burden "any legitimate commerce"). Illinois has affirmatively facilitated its cannabis industry through protectionist laws; it has not prohibited or regulated marijuana as "deleterious" or "injurious" contraband. And because this industry has been legalized by Illinois (and many other states), it is likely to affect interstate commerce, no matter its federal status. The Department points to no authority holding that an item of commerce is outside the Commerce Clause's scope, even where legal and promoted under state law.

The court nonetheless acknowledges that the animating purpose of the Commerce Clause—"fostering free trade among the States," *Tennessee Wine*, 139 S. Ct. at 2460—does not apply with equal force here, where an interstate cannabis market is prohibited. But this odd result stems from the uneasy federal–state balance in this case. Typically, a state's ability to regulate a federally prohibited market would be restricted by the Supremacy Clause, *cf. Gonzales v. Raich*, 545 U.S. 1, 29 (2005), but the federal government has declined to prosecute federal marijuana laws against participants in state-sanctioned cannabis schemes like Illinois'. Dormant Commerce Clause restrictions do not fall out of the picture just because the federal government has not enforced other constitutional limits on states' regulatory powers.

Second, the Department argues that federal courts "cannot" use their equitable power to facilitate federally illegal conduct. (Def.'s Resp. at 20.) In support, the Department points to the doctrine of "unclean hands," which "just means that in equity as in law the plaintiff's fault, like the defendant's, may be relevant to the question of what if any remedy the plaintiff is entitled to." *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985). "An obviously sensible application of

this principle is to withhold an equitable remedy that would encourage, or reward (and thereby encourage), illegal activity, as where the injunction would aid in consummating a crime . . . ." *Id.* As this makes clear, however, the doctrine of unclean hands goes to the weighing of the equities; it is not a categorical proscription on relief. *Cf. Packers Trading Co. v. Commodity Futures Trading Comm'n*, 972 F.2d 144, 149 (7th Cir. 1992) ("[A court considering an unclean litigant] is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'" (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945))). Nor does the application of this doctrine make equitable sense in a case like this one, where the plaintiff seeks to participate in a state-sanctioned (but federally illegal) market and the defendant has allegedly engaged in a constitutional violation in organizing that market. If the "unclean hands" notion has any purchase here, both parties have "unclean hands" in that they are engaging with the business of distributing a controlled substance, but only one party has soiled the federal Constitution.

Nor would granting equitable relief in this case conflict with federal law. The CSA precludes this court from awarding equitable relief that "override[s] Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497–99 (2001) (equitable relief could not create a "medical necessity exception" to the CSA, because the "the statutory prohibitions cover even those who have what could be termed a medical necessity"). But enjoining the licenses awarded under the 2021 lotteries or enjoining the Department from using discriminatory criteria in its licensing scheme would not compel any party to violate federal law, award any illegally derived profits, or entangle this court in the production, sale, or distribution of cannabis. It would prevent Illinois from discriminating against nonresidents in awarding conditional dispensary licenses, only after which would the state award such a license and then regulate cannabis-related conduct.

Though not persuaded by the Department's illegality arguments, the court acknowledges that this issue is unsettled in federal courts across the country and has not been confronted by

the Seventh Circuit.[23]  Most district courts to consider discriminatory marijuana licensing schemes have not substantively addressed whether federal courts can award equitable relief related to state-sanctioned cannabis businesses, though at least one court has accepted this argument. *See Original Invs.*, 542 F. Supp. 3d at 1234–35.  Although all courts to consider the merits have concluded that the dormant Commerce Clause applies to state marijuana regimes, this issue is similarly novel.  The court concludes that Plaintiffs have established a likelihood of success on the merits of their challenge, but acknowledges that this context renders the analysis confusing and unsettled.

---

[23]     As discussed, courts will not provide relief that overrides federal law.  *See In re Arenas*, 535 B.R. 845, 853 (B.A.P. 10th Cir. 2015) (dismissing Chapter 7 bankruptcy case because it would be "impossible" for the trustee to lawfully administer the estate "because selling and distributing the proceeds of the marijuana assets would constitute federal offenses"); *Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 888–89 (N.D. Cal. 2019) (denying marijuana-related trademark under Ninth Circuit precedent interpreting the federal trademark statute to require "lawful use" in commerce).

    Additionally, some courts have refused to grant relief that would expressly require the court to award equity in or profits derived from federally illegal cannabis businesses.  *Sensoria, LLC v. Kaweske*, No. 20-CV-00942-MEH, 2022 WL 204606, at *11–12 (D. Colo. Jan. 24, 2022); *see Shulman v. Kaplan*, No. 219CV05413ABFFMX, 2020 WL 7094063, at *2 (C.D. Cal. Oct. 29, 2020) (plaintiff's RICO claim sought "lost profits from the sale, production, and distribution of cannabis"); *Polk v. Gontmakher*, No. 2:18-cv-01434, 2019 WL 4058970, at *2 (W.D. Wash. Aug. 28, 2019) (plaintiff's contract claim sought "an equity interest in [a cannabis business] and a right to its past and future profits"); *cf. Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1055 (10th Cir. 2017) (Mortiz, J., non-precedential opinion) (concluding that an injunction requiring a bank to provide services to marijuana-related businesses would improperly facilitate illegal conduct).  *But see Tarr v. USF Reddaway, Inc.*, No. 3:15-CV-02243-PK, 2017 WL 8895640, at *6 (D. Or. Nov. 7, 2017), *adopted,* No. 3:15-CV-02243-PK, 2018 WL 659859, at *3 (D. Or. Feb. 1, 2018) (plaintiff could recover economic damages based on lost future earnings from his cannabis business, because it was legal under state law).

    Where the plaintiff seeks to enforce a generally applicable law in the context of a state-sanctioned cannabis business, however, courts have been more willing to provide relief.  *See Kenney v. Helix TCS, Inc.*, 939 F.3d 1106, 1112 (10th Cir. 2019) (applying Fair Labor Standards Act to cannabis business, because "case law has repeatedly confirmed that employers are not excused from complying with federal laws just because their business practices are federally prohibited"); *accord Greenwood v. Green Leaf Lab LLC*, No. 3:17-CV-00415-PK, 2017 WL 3391671, at *3 (D. Or. July 13, 2017), *adopted,* No. 3:17-CV-00415-PK, 2017 WL 3391647 (D. Or. Aug. 7, 2017); *see also Siva Enters. v. Ott*, No. 218-CV-06881CASGJSX, 2018 WL 6844714, at *1–2, 5 (C.D. Cal. Nov. 5, 2018) (cannabis consulting firm could sue former employees for misappropriating information and conspiring to start a competing business, because the dispute "does not involve the actual production or sale of cannabis").

## 2. Irreparable Harm

After demonstrating a likelihood of success on the merits, parties seeking a preliminary injunction must demonstrate that they will suffer irreparable harm if preliminary relief is denied. *See Life Spine, Inc.*, 8 F.4th at 539. "Harm is irreparable if legal remedies are inadequate to cure it." *Id.* at 545.

To establish the possibility of irreparable harm, Plaintiffs briefly explain how the Cannabis Act's licensing scheme might affect competition in the growing market for recreational cannabis. Because "the State holds a limited number of lotteries for a limited number of licenses," Plaintiffs say, their opportunity "to participate in this budding market wanes significantly every day that the Department is allowed to issue more and more conditional licenses" under the allegedly unconstitutional residency-related criteria. (Pls.' Mot. at 25–26.) Plaintiffs also emphasize that the Eleventh Amendment bars them from recovering money damages from the Department, a state agency. (*Id.* at 27–28 (citing *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013)).) Finally, Plaintiffs suggest that the violation of a constitutional right automatically qualifies as an irreparable harm, though they acknowledge that this rule applies mainly to First Amendment rights. (*See id.* at 27 & n.40 (citing, for example, *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).)

The court agrees, at least in theory, that Plaintiffs may suffer an irreparable harm absent a preliminary injunction. By statute, dispensary licenses are scarce and granted only occasionally. If the court declined to grant injunctive relief as to the 2021 lotteries, it would allow the Department to proceed with issuing the first 185 licenses. Once those 185 licenses are issued, Plaintiffs' chances of obtaining their own licenses will be statistically narrowed, as the total number of licenses is capped at 500 by statute. In short, the court concludes Plaintiffs have satisfied the irreparable-harm requirement.

### 3. Balance of the Equities

If a plaintiff satisfies the threshold requirements of the preliminary injunction test, the court proceeds to "a balancing phase." *Cassell*, 990 F.3d at 545 (internal quotation marks omitted). Here, the court "must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Speech First, Inc.*, 968 F.3d at 637. In doing so, the court considers the "public interest," including the effects of a preliminary injunction on "people and institutions that are not parties to the case." *Cassell*, 990 F.3d at 545. Under the "sliding scale" approach, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Courthouse News Serv.*, 908 F.3d at 1068 (internal quotation marks omitted).

Above, the court briefly described the harm that Plaintiffs could face absent a preliminary injunction: The Department could issue the 185 licenses, and Plaintiffs' ability to obtain licenses would be narrowed, given the statutory cap on the number of available licenses.

Having thus concluded that Plaintiffs may be irreparably harmed by the issuance of the 2021 licenses, the court must also assess the severity and likelihood of that harm, weighing it against the harm that a preliminary injunction would cause to third parties. Here, the court notes an obvious concern about the timing of Plaintiffs' request. As the Department points out, a "lengthy, unexplained delay in seeking relief calls into question how urgent the need for preliminary equitable relief really is." (*See* Def.'s Resp. at 33 (quoting *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018)).) *See also* 11A Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2022) ("A long delay by plaintiff after learning of the threatened harm . . . may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").[24]

---

[24] In its response brief, the Department also argues that Plaintiffs' claims are barred by the equitable doctrine of laches. (*See* Def.'s Resp. at 24–26.) The court is not persuaded that laches applies here. Plaintiffs' delay has not prejudiced the Department in its ability to mount a

It is significant that the original version of the Cannabis Act, which was enacted in June 2019, contained the same basic residency-related criteria that Plaintiffs challenge in this case. *See* Cannabis Regulation and Tax Act, 2019 Ill. Legis. Serv. P.A. 101-27 (West) (enacting 410 ILCS 705/1-10, 15-30).  In fact, at least one Plaintiff has specifically declared that he knew about these statutory provisions—and about their alleged ramifications—prior to the January 2020 application deadline.  Plaintiff Finch stated that he "attempted" to apply but gave up after sensing that his application was "doomed" given his lack of Illinois residency.  (Finch Decl. ¶ 5.)[25]   Either way, Plaintiffs did not file suit until well over *two years* after the application deadline.  Even if the court accepts the premise that Plaintiffs were injured again when the second and third lotteries were announced in July 2021 (thereby foreclosing their opportunity to obtain one of those 110 licenses), Plaintiffs still did not file this suit for another eight months.  That lag time is substantial and inexplicable given the timeline of the lotteries that were announced.  As the Department points out, for example, another plaintiff filed a Commerce Clause challenge to the Cannabis Act just one day after the statute was amended in 2021.  *See* Verified Compl. for Declaratory & Injunctive Relief ¶¶ 13, 82–87, *Sozo Ill., Inc. v. Pritzker*, No. 21 C 3809 (N.D. Ill. July 16, 2021).[26]  Plaintiffs offer no explanation for their comparative delay—waiting until after lotteries occurred, after the Department issued its final decision, and after the state court had already spent several months reviewing that decision.

---

defense on the merits (as a result of stale evidence, for example), nor does this case involve potential money damages that have multiplied inordinately as a result of the delay.   Plaintiffs' delay is nevertheless highly relevant to determining whether, in consideration of the harms that might result, Plaintiffs are entitled to the sweeping injunctive relief that they have requested.

[25]   Plaintiff Toigo likewise declared that he "would have applied" if doing so had not been "a futile exercise," though he was less clear about whether he knew about the statute before January 2020.  (Toigo Decl. ¶ 5.)

[26]   Beyond its timing, *Sozo* offers no clear lessons for this case.  The plaintiff voluntarily dismissed the complaint just a few days after filing it.

Timing is not the only fundamental issue with Plaintiffs' request. Additionally, they have not provided facts that enable the court to reliably determine the likelihood that an injunction would help avoid the irreparable harm they have identified (i.e., the narrowing of their opportunity to obtain a license). Recall that Plaintiffs challenge the scoring system used to determine who can participate in a lottery. More specifically, Plaintiffs claim that the residency-related requirements, which represent a subset of the 252 available points, are unconstitutional. But Plaintiffs have not attempted to show that *but for* the allegedly unconstitutional criteria, they might have been eligible for one of the lotteries that they seek to be inserted into. Plaintiffs never submitted license applications to the Department, of course, and they have not offered any other relevant facts here. The court can only speculate whether Plaintiffs would be awarded, say, the 15 possible points for a suitable employee training plan, the 65 possible points for security and recordkeeping plans, or the 5 possible points for a diversity plan. Indeed, Plaintiffs have not even identified the regions for which they would have applied for licenses. The upshot is that the court has been invited to freeze the ongoing licensing process based on mere speculation that doing so *might* allow these two Plaintiffs, about whom the court knows little, to obtain a seat in a highly competitive lottery.[27] That request is unreasonable, especially considering the interests on the other side of the ledger.

---

[27] When the court analyzed whether Plaintiffs have suffered an injury for standing purposes, it asked only whether Plaintiffs were "able and ready" to apply for a license but, given the Cannabis Act's residency-related criteria, could not do so "on an equal footing" with Illinois residents. *Northeastern Florida*, 508 U.S. at 666. In other words, Plaintiffs did not need to show that the residency criteria were a but-for cause of their inability to obtain a license. Here, in balancing the harms that are likely to occur with and without an injunction, the court applies a higher standard of causation. It will not order the sweeping, disruptive relief that Plaintiffs requested without confidence that doing so would help avoid the irreparable harm of Plaintiffs being excluded from a lottery that enables them to compete for a license. For the reasons explained above, the court is not confident, on this record, that enjoining the issuance of the 2021 licenses (and, by extension, ordering the applications to be rescored and the lotteries to be rerun without the residency criteria) would save Plaintiffs from that harm.

Plaintiffs try to downplay the effects of an injunction with respect to the 2021 licenses, but such an order would undoubtedly harm many third parties.[28]  The Cannabis Act was enacted in June 2019.  The deadline to apply for a license passed in January 2020.  Unlike Plaintiffs, approximately 937 entities met the deadline.  In doing so, each applicant submitted a mountain of paperwork and at least one $5,000 fee.  Some of them engaged in the deficiency-notice process; others simply waited with bated breath until the three lotteries eventually took place.[29]  But either way, applicants have justifiably relied on the lottery results announced in September 2021.

Consider the lottery winners—applicants to whom the Department allocated at least one of the 185 licenses.  According to the Department, many "applicants that stand to receive licenses have devoted substantial effort and expense (finding suitable locations and equipment, obtaining permits, engaging personnel, etc.) toward opening their businesses once the state court authorizes them to do so."  (Def.'s Resp. at 23.)  To support that assertion, the Department submitted three declarations from such applicants, each one itemizing tens of thousands of dollars spent in preparing to obtain a full-status license and open a dispensary.[30]  (Exs. D–F to Def.'s Resp. [20-4, 20-5, 20-6].)  The ongoing delay in the Department's issuance of licenses is already harming at least some of these applicants.  (*See, e.g.*, Ex. D to Def.'s Resp. ¶ 12 ("Further delay in the issuance of licenses will continue to cost ReNu IL LLC $2,000/month."); Ex. F to Def.'s

---

[28]     Plaintiffs concede in their complaint that they aim to force the Department to "rerun[]" the three 2021 lotteries.  (Compl. ¶ 2.)  While their motion for preliminary relief is less frank about this goal, the court does not understand how the results of the 2021 lotteries could survive if the court enjoined the issuance of those licenses and the enforcement of the residency-related criteria going forward.  After rescoring the applications using the newly-modified criteria, the lotteries would need to be rerun, presumably with more applicants having qualified to participate.

[29]     Between the time they submitted their applications and the time the Department eventually ran the 2021 lotteries, many applicants also engaged in an additional deficiency-notice process.

[30]     Under the Cannabis Act, an applicant who is issued a (conditional) license must cross several hurdles before they can obtain the full-status license that enables them to operate a dispensary.  *See, e.g.*, 410 ILCS 705/15-25(e), 15-36(b).

Resp. ¶ 12 ("Green Star is obligated to spend money in carrying costs, up to $20,000 per month unless the litigation resolves within the next few months.").)  Granting Plaintiffs a preliminary injunction would compound that delay and require the lottery winners to incur further costs.

Plaintiffs dismiss these third-party concerns as mere "'economic harm' aris[ing] from a 'risk[y]' investment."  (Pls.' Mot. at 28 (second alteration in original) (quoting *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021)); *see also* Pls.' Reply [21-1] at 30.)  But that is all too easy for them to say:  Plaintiffs have identified *no costs* that they have incurred during the administrative process or in reliance on the lottery results.  They sat on the sidelines from June 2019, when the Cannabis Act was enacted, until March 2022, several months into the state court litigation over the Department's final administrative decision.  Now they beg for the mere opportunity to compete for a dispensary license, all while casually dismissing the immediate harms that an injunction would cause to applicants who have been working hard to secure (and are now on the cusp of securing) the exact same thing.

The facts of *Lowe v. City of Detroit*, which Plaintiffs cite, are critically different from this case.  In *Lowe*, the plaintiff challenged Detroit's licensing scheme for recreational marijuana dispensaries, which included residency-related provisions.  In granting a preliminary injunction against the enforcement of the ordinance, the court found that the financial interest of third parties (who, like the third parties here, stood to benefit from the residency requirements) did not weigh heavily because "any such economic harm would be the result of these applicants investing money before obtaining a license, which they did at their own risk."  *Lowe*, 544 F. Supp. 3d at 816.  The catch, though, is that the plaintiff in *Lowe* had filed the lawsuit almost a month before the deadline to *apply* for a license had even passed.  *Id.* at 807.  Because the City of Detroit was at such an early stage in implementing the disputed licensing scheme, investments that third parties had already made were not reasonable (or at least worthy of special concern), according to the court.  In contrast, by the time these Plaintiffs filed this motion, the Department had not merely accepted applications.  It had scored them, adopted a deficiency-notice process, run three

lotteries, and issued a final administrative decision allocating the licenses in question. Investments made in reliance on that process, and put in jeopardy by Plaintiffs' request, are not unreasonable. In fact, they are more substantial than any harm Plaintiffs have shown that they are both likely to suffer if an injunction is denied and unlikely to suffer if one is granted.

A final note about the Department's two federalism arguments: First, and more narrowly, the Department argues that enjoining the issuance of the 2021 licenses would violate the Anti-Injunction Act (AIA), which provides, with exceptions not relevant here, that "[a] court of the United States may not grant an injunction to stay proceedings in a State court." 28 U.S.C. § 2283. As the Department points out, this rule is one of substance, not of form. It "cannot be evaded by addressing the [federal] order to the parties or prohibiting utilization of the results of a completed state proceeding." *Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970). According to the Department, the injunction that Plaintiffs have requested would effectively prohibit the Department from implementing future rulings of the state court; this argument appears to rest on speculation that state court will eventually affirm the Department's final administrative decision with respect to some or all of the 2021 licenses. Second, the Department urges this court to abstain from entertaining Plaintiffs' request regarding the 2021 lotteries. Although the Department concedes that no specific abstention doctrine fits well here, it contends that, given the state court's ongoing review of the Department's final administrative decision, this court should deny Plaintiffs' motion under the broader principles of equity, comity, and federalism. *See, e.g.*, *J.B. v. Woodard*, 997 F.3d 714, 721–22 (7th Cir. 2021).

The court is uncertain that either doctrine squarely applies here, but nevertheless agrees that concern for the interplay between the state and federal cases counsels against the disruptive relief that Plaintiffs have requested. Plaintiffs characterize this case as a principled debate over the constitutionality of the Cannabis Act and the state case as a mere "administrative" review of the Department's decision. But the two proceedings do not merely happen to concern the same statute. They both concern the issuance and possession of the same 185 licenses.

After an extended administrative process dating back to 2019, those 185 licenses were provisionally allocated last year.  Now the recipients are waiting—in some cases at a substantial cost—for the process to move forward.  And at least 70 petitioners who believe they were wrongfully excluded from those lotteries are pressing their claims in the state court.  The state court faces the unenviable task of finding solutions that are "fair, equitable, and expeditious to all stakeholders."  Order Granting Limited Remand at 1, *In re Cannabis Dispensary Litig.*, No. 21 CH 3730 (Ill. Cir. Ct. Cook Cnty. May 17, 2022).  Granting Plaintiffs' request would stop that process in its tracks.[31]

If this court enjoined the issuance of the 185 licenses that were allocated in 2021, and enjoined the enforcement of the residency-related criteria going forward, it would render the Department's administrative decision, and the state court's efforts to review that decision, a "nullity."  (Def.'s Resp. at 1.)  Although Plaintiffs try to avoid this conclusion, it is clear that prohibiting the enforcement of the residency-related criteria would eviscerate the results of the three lotteries and frustrate the state court's ongoing efforts to order corrective lotteries.

Recall that the Tied Applicant Lottery included every application that had achieved a perfect score of 252 points, while the Qualifying Applicant Lottery and Social Equity Justice Involved Lottery each included applications that had, among other things, received at least 213 points.  If this court were to enjoin the residency-related criteria, the theoretical maximum score would decrease to some number less than 252, and the point threshold for the two social-equity

---

[31]     Above, the court noted the Department's argument that the injunction Plaintiffs have requested would violate the Anti-Injunction Act, 28 U.S.C § 2283.  While the court agrees with the general point that a federal injunction would disrupt the state court's ongoing efforts to craft remedies for the many petitioners in that case, it does not find that a federal injunction would literally "stay" the state case or prohibit the Department from implementing the results of a "completed state proceeding."  *See Atlantic Coast Line R.R. Co.,* 398 U.S. at 287.  For example, this court is aware of no state court order that *requires* the Department to issue the first 185 licenses as they were allocated in 2021.  Thus, a federal injunction that prohibited the Department from issuing those licenses would not, in letter or spirit, prevent the Department from complying with a state court's orders.

lotteries would necessarily decrease as well.[32]  These changes would almost certainly increase the number of participants who would have been eligible to participate in the three lotteries—and thus decrease the odds of success that any one participant would have.  Given these changes, it is difficult to imagine how the 2021 results would not have to be undone and the lotteries themselves completely rerun.  Plaintiffs cannot simply be inserted retrospectively into the lottery process under newly-modified criteria, because that very modification to the criteria would require a different outcome for the rest of the participants as well.

In sum, the court denies Plaintiffs the sweeping, highly disruptive relief they seek with respect to the 2021 licenses.

## II.     Ongoing Enforcement of Residency Requirements

Plaintiffs have also made a second request: that the court enjoin the Department "from enforcing the Illinois residency requirements in 410 ILCS 705/1-10, 15-30(c)(5), and (c)(8), or any other future residency requirements under [the Cannabis Act]."  (Pls.' TRO at 2.)  These challenged provisions all relate to the scoring criteria used in the 2021 lotteries:  Section 1-10 provides relevant definitions (including the requirement that a "Social Equity Applicant" be an Illinois resident), subsection 15-30(c)(5) awards 50 points to "Social Equity Applicants," and subsection 15-30(c)(8) awards 5 points to Illinois residents.  To the extent Plaintiffs argue that issuing licenses under these criteria "enforces" unlawful criteria, this mirrors their other request for relief—enjoining the issuance of licenses that were allocated in the 2021 lotteries.  The court denies this request for the reasons already discussed.  Plaintiffs' distinct requests for injunctive relief are, as best this court can tell: (1) enjoining any prohibition on Plaintiffs' investing as majority

---

[32]     If the Department were prohibited from awarding the 5 points for having an "Illinois owner" or *any* of the 50 points for being a Social Equity Applicant, the maximum score an application could receive would decrease from 252 to 197.  But it is not clear that Plaintiffs' request compels such a substantial reduction in the number of possible points.  Although Illinois residency is a statutory prerequisite to obtaining any of the 50 "social equity" points, the other sub-criteria for being a "Social Equity Applicant" label would not necessarily become unenforceable.  Confusion about scoring confirms the court's belief that the remedy Plaintiffs seek would be unfairly disruptive.

shareholders in companies allocated a conditional license and (2) enjoining any residency requirements in the proposed 2022 lottery. As explained below, the court denies these requests as well.

### A.    Investment "Prohibition"

Plaintiffs argue that the challenged residency requirements, in conjunction with other statutory provisions, effectively "forbid[] [them] from investing as majority shareholders" in companies that have been allocated a license. (Pls.' Reply at 18.) Specifically, Plaintiffs point to provisions stipulating that:  the Department "shall verify an applicant's compliance with the requirements of this Article and rules adopted under this Article before issuing a [conditional license]," 410 ILCS 705/15-35(j), 15-35.10(j); *see id.* § 15-30(h); the Department "may, in its discretion, refuse to issue an authorization" to any applicant who "is unqualified to perform the duties required of the applicant," *id.* §§ 15-30(f)(1), 15-35(h)(1), 15-35.10(h)(1); and transfers of licenses from Qualified Social Equity Applicants are "subject to all other provisions of this Act." *Id.* § 7-25(b).

Additionally, for applicants allocated a license, "the information and plans provided in the application . . . shall become a condition of [the license and any full-status license]," and applicants must notify the Department of any "material changes" in their application.  *Id.* §§ 15-30(i), 15-35(k), 15-35.10(k).  The Department "shall review" those changes and "may reevaluate its prior decision regarding the awarding of [a license], including, but not limited to, suspending or permanently revoking [the license]"; "[f]ailure to comply with the conditions or requirements in the application may subject the dispensing organization to discipline, up to and including suspension or permanent revocation of its authorization or [license] by the Department." *Id.*  Plaintiffs also point to a question in an Advisory Notice issued by the Department, which asked about the effect on an entity's conditional license if, after raising capital, it no longer meets certain ownership criteria.  The Department explained that this is "an adverse material change" and "[f]ailure to disclose an adverse material change to the Department may result in denial or revocation of a

license."[33]  Taking these provisions together, Plaintiffs contend, a material change (such as a non-Illinois resident investing as a majority shareholder) renders the applicant unqualified and will result in the revocation of the license.   (Pls.' Reply at 19.)

This argument lacks both clarity and candor.  Plaintiffs raise this solely to argue that they are suffering an "ongoing violation," such that they have standing to challenge residency requirements in the Cannabis Act's scoring criteria; it is not clear whether they seek to enjoin these purported "majority investor" restrictions.   In any event, Plaintiffs raised this statutory argument for the first time in their reply brief, and it is well-established that such arguments are waived.  *See, e.g.*, *Carroll v. Lynch*, 698 F.3d 561, 564 n.2 (7th Cir. 2012).  This case exemplifies waiver's animating justification:  Plaintiffs' theory rests on speculation about the Cannabis Act's interpretation and the Department's potential actions, something the Department (given the opportunity) may well be able to shed light upon.  And even without the Department's input, the court is not moved by Plaintiffs' interpretation of the Cannabis Act.  The provisions requiring applicants and transfers to comply with the Act's general requirements do not, on their face, refer to the challenged residency requirements.  Rather, as made clear in the statute and the Department's Advisory Note, changes to an applicant's status—including changes to ownership due to capital investments—are governed by the "material change" provision. *See* 410 ILSC 705/15-30(i), 15-35(k), 15-35.10(k).  This merely provides that the applicant must inform the Department, who *may* then potentially revoke the license or impose other discipline; it does not appear that revocation is required as a matter of law, as Plaintiffs assert.

Again, because Plaintiffs first presented this argument in their reply, the Department did not weigh in on Plaintiffs' standing to challenge the Cannabis Act's residency requirements under

---

[33]      The question concerned Social Equity Applicants, who must be at least 51% owned by Illinois residents; then, at least 51% of the ownership or 51% of employees must qualify under additional criteria related to social-equity concerns.  *See* Ill. Dep't of Fin. & Prof'l Reg., *Advisory Notice*, at 82 (last visited June 1, 2022), https://idfpr.illinois.gov/Forms/AUC/ Conditional%20Adult%20Use%20Dispensing%20Organization%20License%20Application%20 QA%20Round%201.pdf.

this majority investor theory. But even assuming (without deciding) that the risk of the Department's revoking a license could in some circumstances inflict a present and constitutionally cognizable harm,[34] Plaintiffs have not established that they themselves are harmed by these provisions. Finch is now an Illinois resident, so there is no Commerce Clause–related impediment preventing him from investing as a majority shareholder. And Toigo (who still lives outside Illinois) has not plausibly alleged that he would invest as a majority shareholder without residency requirements. He asserts that he "would have . . . invested in an Illinois-based cannabis company to become a majority shareholder," but believed he "could not." (Toigo Decl. ¶ 5.) Toigo, however, points to no laws even plausibly preventing nonresidents from investing in already-running cannabis companies. Toigo also asserts that if the challenged provisions regulating conditional licenses were enjoined, he "would consider" investing as a majority shareholder. (*Id.* ¶ 7.) This noncommittal suggestion—that he would *consider* such an investment—does not meet federal pleading standards to "plausibly" suggest an injury in fact. *See Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015) (*Twombly–Iqbal* plausibility requirement applies to facial standing challenges); *cf. Alliant Energy Corp. v. Bie*, 277 F.3d 916, 918, 920 (7th Cir. 2002) (plaintiff met the prior, lower pleading standard of "imagin[ing] facts *consistent with* th[e] complaint and affidavits that will show . . . standing," by alleging that it "would sell more than 10% of its stock to raise investment capital").

Plaintiffs therefore lack standing to challenge the residency criteria on this "majority investor" theory. And even if they had standing, they have not alleged an irreparable harm (or

---

[34] *Cf. Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497–99 (7th Cir. 2005) (even where the state's approval of plaintiff's gambling application was uncertain, plaintiff could challenge an allegedly unconstitutional casino agreement, which made plaintiff's venture "more risky" and forced it to "compensate for this risk by offering [potential investors] a higher rate of return"); *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 921 (7th Cir. 2002) (statute prohibiting companies from selling 10% of their stock without prior approval "interfere[s] with the competition for capital" and "deprive[s] the firm of an option value).

any injury whatsoever), that would support entry of a preliminary injunction.  *See Life Spine, Inc.*, 8 F.4th at 545.

### B.     Proposed 2022 Lottery

State law requirements that privilege in-state residents over out-of-state commercial actors may well run afoul of the dormant Commerce Clause.  The court nevertheless denies Plaintiffs' broad request to enjoin "any future residency requirements," at least at this time.  The doctrine of ripeness prevents the "premature" adjudication of "claims premised on uncertain or contingent events."  *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 676 (7th Cir. 2019).  Ripeness is typically considered part of Article III's case-or-controversy requirement, intended to ensure that federal courts refrain "from deciding a question that depends on so many future events that a judicial opinion would be 'advice about remote contingencies.'" *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377–378 & n.1 (7th Cir. 2019) (quoting *Rock Energy Co-op. v. Village of Rockton*, 614 F.3d 745, 748 (7th Cir. 2010)).  Even where a case is constitutionally ripe, there may be "prudential reasons for refusing to exercise jurisdiction."  *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 57 n.18 (1993).  When considering ripeness, courts focus on (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration."  *Metro. Milwaukee Ass'n of Com. v. Milwaukee Cnty.*, 325 F.3d 879, 882 (7th Cir. 2003) (quoting *Abbott Lab'ys v. Gardner,* 387 U.S. 136, 149 (1967)).

Under the amended Cannabis Act, the Department must issue 50 licenses by December 21, 2022, and may issue up to 500 full-status licenses at any time.  410 ILCS 705/15-35.20(a), (c).  The provision governing issuance of these licenses (or any license allocated after January 1, 2022) states: "[T]he Department may publish an application to issue additional [licenses], pursuant to the application process adopted under this Section.  The Department may adopt rules to issue any [licenses] under this Section."  *Id.* § 15-35.20(a).  In March 2022, the Department announced that it would issue 55 additional licenses through a 2022 lottery and under a new proposed rule, which was then published in the *Illinois Register*.  *See* 46 Ill. Reg. at 5,127.  As

described earlier, this proposed rule creates an entirely new application system, with two options for eligibility:   Option 1 requires Illinois residency, with some additional criteria; or Option 2 requires satisfying at least four of seven rather complicated criteria, some of which implicitly reference Illinois.[35]  *Id.* at 5,141–43.  The Department's position seems to be that it will run the 2022 lottery under this new rule, rather than the original statutory criteria.  Plaintiffs evidently assume as much as well; they focus on the proposed rule in their reply brief.  But the parties disagree on whether the proposed rule may be challenged before finalization, which requires public notice and approval by a legislative committee.  *See* 5 ILCS 100/5-6, 5-10(c).

Given the nature of Plaintiffs' challenge to the proposed rule, the possibility of a change (even a small one) in the rulemaking process renders adjudication premature.  Typically, "a facial constitutional challenge presents only a legal issue—the quintessentially 'fit' issue for present judicial resolution."  *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 n.3 (7th Cir. 1998).  "But even purely legal issues may be unfit for review."  *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003); *accord Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003).  That is the case here.  After public notice and committee review, Illinois may modify the proposed rule in ways that alter the legal analysis.  In dormant Commerce Clause cases, much depends on whether the rule is facially discriminatory (and virtually per se unconstitutional) or facially neutral (and dependent on the degree to which it affects interstate commerce).  *See, e.g.*, *Regan*, 934 F.3d at 703.  Removing the Illinois residency

---

[35]     The primary remnant of the original scoring system relates to "Social Equity Applicants."  This, as discussed, requires the applicant to be an Illinois resident and satisfy certain social-equity related criteria—either having lived in a Disproportionately Impacted Area, having been impacted or having a family member who has been impacted by Illinois drug laws, or having employees who satisfy similar criteria.  410 ILCS 705/1-10.  Option 1 of the proposed rule requires Illinois residency and similar (though not identical) social-equity criteria; one of Option 2's seven criteria can also be satisfied with similar social-equity criteria.  *See* 46 Ill. Reg. at 5,141–43, § 1291.410(e)(6)(A)(i), (ii), (B)(i).  Two of Option 2's other criteria expressly involve a "Social Equity Applicant."  *See id.* § 1291.410(e)(6)(B)(iii) (applicant must purchase 25% of its products from infusers or growers licensed as Social Equity Applicants for the first two years of business); *id.* § 1291.410(e)(6)(B)(vi) (applicant must pay $250,000 to a cannabis business licensed as a Social Equity Applicant or an Option 1 applicant).

requirement in Option 1 or changing implicit references to Illinois in Option 2 could shift the proposed rule into the latter category. The court's willingness to weigh in on the proposed rule, published after Plaintiffs filed their request for injunctive relief, is further undermined by Plaintiffs' failure to address the rule in depth. In their reply, Plaintiffs broadly characterize the rule as requiring the applicant to be an Illinois resident or to financially support Illinois entities (Pls.' Reply at 8–9 & n.7), but do not analyze the specific criteria in Option 2 or discuss the possibility that any criteria could be severed. Plaintiffs do note that the Department has not offered evidence that "it might change its mind about whether to continue discriminating against nonresidents" (*id.* at 9), but it is Plaintiffs—not the Department—who bear burden of establishing ripeness. Their reference to the ambiguous terms of a non-final plan does not meet that burden.

Nor is there any hardship to Plaintiffs in delaying review until the rule is finalized. Plaintiffs may demonstrate hardship by showing that (1) "enforcement is certain, only delayed," or (2) "even though enforcement is not certain, the mere threat of future enforcement has a present concrete effect on [Plaintiffs'] day-to-day affairs and 'irremediably adverse consequences' would flow from a later challenge." *Metro. Milwaukee*, 325 F.3d at 882 (quoting *Reno,* 509 U.S. at 58); *see also Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 63 (2d Cir. 1988) (challenge to a proposed rule may be ripe where "the prospect or fear of future events may have a real impact on present affairs" (citation omitted)). For the reasons discussed, however, the court is unable to conclude that enforcement of specific residency criteria is "certain." Nor have Plaintiffs offered facts suggesting that the proposed rule has in any way affected their lives. There is no threat of criminal or civil enforcement, and there is no real prospect of chilling Plaintiffs' applications—the Department's plan to open applications in the summer or fall of 2022 depends on when the proposed rule (which could still change) becomes permanent. *See* 2022 Press Release at 2.

The court recognizes that the 2021 regulatory scheme effectively precluded out-of-state purveyors from seeking a dispensary license, and the 2022 scheme may do so as well. The court nevertheless denies, without prejudice, Plaintiffs' request to enjoin enforcement of the proposed

rule governing the 2022 lottery.  Because Plaintiffs have not established that the Department plans to enforce the Cannabis Act's residency requirements in any future lottery, their request to enjoin future enforcement of those provisions is also unripe.

### CONCLUSION

For the reasons discussed above, Plaintiffs' emergency motion for a temporary restraining order and preliminary injunction [6] is denied.  As mentioned, the Department has previously stipulated that it would not issue any licenses pending further order of this court on Plaintiffs' motion and further order of the Circuit Court of Cook County on the stay [11].  The Illinois court has lifted its stay on the issuance of the licenses allocated under the 2021 lotteries [25], and this court has denied Plaintiffs' motion to enjoin issuance of those licenses.  The Department is now free to issue the 2021 licenses, but must continue to abide by its stipulation with respect to the 2022 licenses.

The Department is directed to file a pleading responsive to the complaint on or before June 30, 2022.

ENTER:

Dated:  June 9, 2022

REBECCA R. PALLMEYER
United States District Judge

44